## *In re* KEMMLER.

*(Cayuga County Court. October 9, 1889.)*

1. HABEAS CORPUS—CONSTITUTIONAL LAW.

Code Civil Proc. N. Y. § 2032, provides that in *habeas corpus* proceedings the prisoner is to be remanded if it appears that he is detained in custody by virtue of the final judgment or decree of a competent tribunal of civil or criminal jurisdiction, and section 2031 provides for his discharge if no lawful cause for his imprisonment is shown. Section 2034 prohibits the court, on the return of the writ, from inquiring into the legality or justice of any judgment or decree specified in section 2032, except as therein stated. *Held,* that upon the return to a writ of *habeas corpus* the court may inquire into the constitutionality of the statute under which the judgment was rendered; for it is without authority, and not the judgment of a competent tribunal, if based upon an unconstitutional statute.

[1] From 23 Abb. N. C. 239.

**2. SAME—CRUEL AND UNUSUAL PUNISHMENTS—DEATH BY ELECTRICITY.**
    Laws N. Y. 1888, c. 489, § 5, provides: "The punishment of death must in every case be inflicted by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death, and the application of such current must be continued until such convict is dead." *Held*, that where a person sentenced to death under this law assails it on *habeas corpus* as contravening the prohibition by the state constitution of cruel and unusual punishments, the burden is on him to prove beyond doubt that such punishment is cruel and unusual in order to overcome the presumption of the constitutionality of the law.

Petition for writ of *habeas corpus.*
    *W. Bourke Cockran* and *Charles S. Hatch*, for petitioner. *Atty. Gen. Tabor, Dep. Atty. Gen. Poste, Dist. Atty. Quinby*, and *Dist. Atty. Rich*, for the People.

DAY, J.   At a court of oyer and terminer held at Buffalo, N. Y., on the 10th day of May, 1889, in a criminal action wherein the people of the state of New York were plaintiffs, and William Kemmler, otherwise called John Hort, was defendant, he was convicted of murder in the first degree, in that, on or about March 29th of that year, in that city, he killed Matilda Ziegler, *alias* Matilda Hort, from a deliberate and premeditated design to effect her death, and on the 14th day of May aforesaid he was, for his crime, sentenced by said court to suffer death, to be inflicted by the application of electricity, in the Auburn state-prison, or in the yard or inclosure thereto adjoining, on some day in the week commencing June 24, 1889, and in the mean time to be removed to, and until the infliction of such punishment to be kept in, solitary confinement in said prison, pursuant to the provisions of chapter 489 of the Laws of 1888, amending certain sections of the Code of Criminal Procedure relative to the infliction of the death penalty, and to provide means therefor; and on the 16th day of May aforesaid, a warrant commanding his confinement and execution pursuant to said sentence was issued under the hand of the Hon. HENRY A. CHILDS, the justice presiding at said court, and its seal, directed to Charles F. Durston, Esq., agent and warden of said prison; and thereafter, and on the 11th day of June last, upon the petition of Charles S. Hatch, Esq., attorney for the defendant, setting forth the imprisonment and threatened deprivation of the life of the defendant, pursuant to said judgment, and alleging its invalidity, under the constitution of the United States and that of the state of New York, as imposing cruel and unusual punishment, a writ of *habeas corpus* was allowed by the Hon. CHARLES C. DWIGHT, justice of the supreme court, directed to said agent and warden, returnable on the 18th day of the same month before the county judge of Cayuga county, who, by consent, adjourned the proceedings from time to time, till the 26th day of June, when the agent and warden made return to the writ, in substance, that he was such officer, and that he held the defendant by virtue of said judgment and warrant, averring the punishment aforesaid not to be cruel and unusual, and said act of the legislature not to be violative either of the constitution of the state of New York or that of the United States; and this return the defendant controverted, admitting his confinement by said agent and warden by virtue of said judgment and warrant, but alleging their nullity, as contravening the constitutional inhibition against punishments cruel and unusual; and thereupon, also, the defendant, by his counsel, offered to prove "that the infliction of the penalty named in the sentence, that is to say, the passing of an electrical current through the body of the said William Kemmler, is a cruel and unusual punishment within the meaning of the constitution, and that it cannot, therefore, be lawfully inflicted, and to establish the facts upon which the judge can pass, as to the character of the penalty." The attorney general objected, and, the objection being overruled, the appointment of a referee was agreed upon, for the purpose of taking the testimony, and Tracy C. Becker, Esq., was named such referee accordingly, and

he has now made report, transmitting a large amount of testimony taken by him, and argument has been had.

The primary inquiry is whether, in a proceeding like the present, the constitutionality of the statute under which the prisoner is detained can be impeached. By section 2032 of the Code of Civil Procedure it is provided that in *habeas corpus* proceedings the prisoner is to be remanded, if it appears that he is detained in custody by virtue of the final judgment or decree of a competent tribunal of civil or criminal jurisdiction, or by virtue of an execution or other process issued upon such a judgment. By section 2031 the prisoner's discharge is provided for "if no lawful cause for the imprisonment or restraint, or for the continuance thereof, is shown, whether the same was upon a commitment for an actual or supposed criminal matter, or for some other cause;" and by section 2034 the court or judge, upon the return of the writ, is prohibited from inquiring into the legality or justice of any mandate, judgment, decree, or final order specified in section 2032, except as therein stated. The Revised Statutes regulating proceedings on *habeas corpus*, in force before the adoption of the Code, were to the same effect. In *Re Donohue*, 1 Abb. N. C. 1, it was held by the supreme court that on *habeas corpus* the constitutionality of the law under which the prisoner was committed could not be attacked. The reason assigned was that so to do would be to inquire into the legality of the judgment. But the case of *People* v. *Liscomb*, 60 N. Y. 559, in the court of appeals, must, I think, be regarded as establishing a different doctrine. It was there said that it is no new feature of the law that inferior magistrates may, when thereunto called, sit in judgment on the jurisdiction of the highest courts; that the prohibition of the *habeas corpus* act, forbidding the inquiry by the court or officer into the legality of the previous judgment, decree, or execution, does not and cannot, without nullifying in good measure the provisions of certain sections of the act, take from the court or officer the power, or relieve from the duty of determining whether the process judgment, decree, or execution emanated from a court of competent jurisdiction, and whether the court making the judgment or issuing the process, had the legal and constitutional power to give such judgment, or send forth such process. It simply prohibits the review of the decision of a court of competent jurisdiction. If the record shows that the judgment is not merely erroneous, but such as could not under any circumstances, or upon any state of facts, have been pronounced, the case is not within the exception of the statute, and the applicant must be discharged. As well at the common law as under the statutes, if the party is detained on process, the existence and validity of the process are the only facts in issue, and the right to inquire into the validity of the process is co-extensive with that which is allowed in an action for false imprisonment. If the process is valid on its face, it will be deemed *prima facie* legal, and the prisoner must assume the burden of impeaching its validity by showing want of jurisdiction. Error, irregularity, or want of form is no objection; nor is any defect which may be amended or remedied by the court from which it issues. If there was no legal power to render the judgment or issue the process, there was no competent court, and consequently no judgment or process. All is *coram non judice*, and void. It will not answer to say that a court having power to give a particular judgment can give any judgment, and that a judgment not authorized by law is merely voidable, and not void. This would be trifling with the law, the liberty of the citizen, and the protection thrown around his person by the bill of rights and the constitution, and creating a judicial despotism. It would be to defeat justice, nullify the writ of *habeas corpus* by the merest technicality and the most artificial process of reasoning. A sentence not warranted by statute is *ultra vires*, and, like every other act, whether judicial or ministerial, done without legal authority, is void. When the judgment is such as could not, under

any circumstances, or upon any state of facts, have been legally pronounced, the prisoner is entitled to be discharged. *People* v. *Warden*, 100 N. Y. 24, 2 N. E. Rep. 870; *People* v. *Nash*, 12 Wkly. Dig. 545; *Ex parte Lange*, 18 Wall. 163; *People* v. *Kelly*, 32 Hun, 536. There is no authority for this judgment and warrant, unless it be found in the law of 1888. I conclude, therefore, that the constitutionality of that law is a proper subject of inquiry on this application; since, if it is unconstitutional, it is no law, and the judgment of the court based upon it was without authority. It was no judgment of a competent tribunal.

The constitution of the United States and that of the state of New York, in language almost identical, provide against cruel and inhuman punishment; but it may be remarked in passing that with the former we have no present concern, as the prohibition therein contained has no reference to punishments inflicted in state courts for crimes against the state, but is addressed solely to the national government, and operates as a restriction on its power. Story, Const. § 1904. But our own state fundamental law is so benignant that not even he who cruelly murders can be cruelly punished. Section 505 of the Code of Criminal Procedure, in force prior to the enactment of 1888, provided that the punishment of death should in every case be inflicted by hanging the convict by the neck until dead, and was almost a literal transcript of the statute which it superseded. 2 Rev. St. p. 659, § 25. By chapter 489 of the Laws of 1888, § 5, that section of the Code of Criminal Procedure was amended so as to read as follows: "The punishment of death must, in every case, be inflicted by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death; and the application of such current must be continued until such convict is dead." And it is this attempted change in the mode of inflicting the death penalty as punishment for crime that provokes the present controversy, and it is in these circumstances that I am asked to discharge the prisoner from his present detention; it being contended in his behalf that the legislative enactment under consideration provides punishment both cruel and unusual, the infliction whereof may well result in subjecting its unfortunate victim to the most extreme and protracted vigor and subtility of cruelty and torture; while, on the other hand, it is insisted that the act is one promotive of reform, a step forward and in keeping with the scientific progress of the age; that the application of electricity as proposed will result in the immediate and painless death of the culprit, so that the unsightly and horrifying spectacles which now not infrequently attend executions by hanging will effectually be prevented; that the question is not whether any particular engine provided or to be provided for use in the attempted enforcement of the law will prove successful in operation, whether the continuous or alternating current is better for the purpose, or whether any certain quantity or force of electricity will kill the condemned, except as that force or quantity is limited by ability to generate it. Paradoxical as it may seem, both of these positions are professedly based on grounds of mercy and humanity.

The question of the constitutionality of this law is of importance, for, apart from any other consideration, should it ultimately be held unconstitutional, not only may the condemned possibly escape his desert for adjudicated guilt, but all other persons committing capital crimes since the beginning of the current year may likewise go unpunished, inasmuch as it is expressly provided in section 10 of said chapter that, after it takes effect, a crime punishable by death must be punished according to its provisions, and not otherwise; and it is clear that any penal act hereafter passed to apply to those cases would necessarily and justly be held void, as *ex post facto*. And it is a question of novelty. There is no precedent for guidance or following. It is the pioneer case, and its final decision is awaited with interest, not only in this state, but in other states and countries. In this connection it is noteworthy that the

questionable chapter became law after much more than ordinary consideration and deliberation. The executive had called the attention of the legislature to the subject of the infliction of the death penalty by hanging, suggesting the question of change, and by an act passed in 1886, and amended in 1887, a commission, consisting of gentlemen of recognized standing, ability, and learning, had been appointed to investigate and report the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases; and, after having made the subject their special care and study, they made report of their proceedings, and the act whose provisions are now criticised was the outcome of their labors and judgment, and met legislative favor and executive approval. And it is against all this that I am now asked to interpose and hold null that result as counter to the constitution.

The question is also one largely of fact. Section 2031 of the Code of Civil Procedure provides that the court or judge before which or whom a prisoner is brought by virtue of a writ of *habeas corpus* must, immediately after the return of the writ, examine into the facts alleged in the return, and into the cause of the imprisonment or restraint of the prisoner, and, as before said, must make a final order to discharge him therefrom, if no lawful cause for the imprisonment or restraint or for the continuance thereof is shown, whether the same was upon a commitment for an actual or supposed criminal matter, or for some other cause. And it was because the burden of satisfying the judicial mind of the cruel and unusual, and therefore unconstitutional, character of the law in question was upon the defendant (*People* v. *Liscomb, supra,*) and to afford him opportunity to present the facts as he claimed them to be, that, as the better course, the reference was ordered, notwithstanding what was said by EARL, J., in *Re Railroad Co.*, 70 N. Y. 327, to the effect that proof could not be taken for the purpose of showing a statute, valid and regular on its face, to be unconstitutional, because it was considered that this case widely differed from that, inasmuch as in this, as not in that, scientific questions were involved; that an intelligent decision of the question would seem to require that there be furnished to those called upon to decide all the light that scientists, experts, and others having large experience in electrical matters should be able to give, matters which could not be said to be of common knowledge, and concerning which judges could not be supposed to have any better understanding than legislators; and, generally, upon the grounds and for the reasons usually assigned for the admission of so-called expert testimony on ordinary trials of questions of fact; and upon the further consideration that, if the reference should be held, on appeal, to have been rightfully ordered, the testimony would be at hand for use, and otherwise it might be disregarded, and the error would be harmless. It was, however, to be expected, as the result is, that the testimony would prove to be conflicting, and, of necessity, in great degree speculative and hypothetical, for on no person has the experiment yet been tried, and no endeavor to take human life by means of electricity has been made, under the circumstances and conditions, and with the appliances, indicated by scientific knowledge as those most favorable to produce a fatal result.

Although the phrase "cruel and unusual punishments" has a history of 200 years, it is not an easy task to define it. It was said in *Wilkerson* v. *Utah*, 99 U. S. 130, that "difficulty would attend the effort to define with exactness the extent of the constitutional provision." Courts have rarely been called upon to construe it. Nor is it now at all needful, in the view which I entertain of the present case, and of my duty in regard to it, to attempt any accurate and comprehensive definition. Beyond doubt, many of the methods used for the infliction of the death penalty in other times and countries would to-day and in our land be held illegal. As among these may be mentioned crucifixion, boiling in water, oil, or lead, blowing from cannon's mouth, burning, break-

ing on the wheel, dismemberment, burying alive. But not death itself is a cruel and unusual punishment, nor is death by gunshot or by hanging, though there seems to be an element of cruelty inseparable from any taking of human life as punishment for crime; but it is clearly not against this that the constitutional prohibition is directed. It was held by the supreme court of the United States in the *Wilkerson Case* above cited, that a sentence to death by shooting was not illegal in Utah. Death was the penalty for murder at the common law, and of its infliction, Blackstone said: "If upon judgment to be hanged by the neck till he is dead the criminal be not thoroughly killed, but revives, the sheriff must hang him again; for the former hanging was no execution of the sentence. And if a false tenderness were to be indulged in such cases, a multitude of collusions might ensue. Nay, even while abjurations were in force, such a criminal, so reviving, was not allowed to take sanctuary, and abjure the realm, but his fleeing to sanctuary was held an escape in the officer." 4 Comm. 406. "Any punishment declared by statute for an offense which was punishable in the same way at the common law could not be regarded as cruel or unusual in the constitutional sense." Cooley, Const. Lim. 329. The common-law rule applied in this state when the constitutional provision under consideration was adopted, and long before and after, until the act of 1888 took effect; and no question was made as to the legality of death by hanging. That statute but changed the means whereby to produce death. And can it be said that in this case it has been plainly and beyond doubt established that electricity as a death-dealing agent is likely to prove less quick and sure in operation than the rope? I believe not.

But, back of all other questions mooted on the argument lies another, and it is, what is the duty of courts and judicial officers when called upon to declare, in a case like this, a legislative act void as against the constitution, and by what rule should they be governed? "The power of the state over crimes is committed by the constitution to the legislature, without a definition of any crime, without a description of any punishment to be adopted. * * * It is, then, a power to produce the end by adequate means, a power to establish a criminal code, with competent sanctions, a power to define crimes and prescribe punishments by laws, in the discretion of the legislature." *Barker* v. *People*, 3 Cow. 705. Every presumption is in favor of the act. *People* v. *Comstock*, 78 N. Y. 361. Every statute is presumed to be constitutional, and every intendment is in favor of its validity. When a statute is challenged as in conflict with the fundamental law, a clear and substantial conflict must be found to exist to justify its condemnation; but, when found, courts must not hesitate to condemn. The constitution is the voice of the people speaking in their sovereign capacity, and it must be heeded. *In re Railroad Co.*, 70 N. Y. 342; *Warner* v. *Beers*, 23 Wend. 166. Courts do not sit in review of the discretion of the legislature, or to determine upon the expediency, wisdom, or propriety of legislative action in matters within the powers of the legislature. *People* v. *Albertson*, 55 N. Y. 54. "It is a solemn act in any case to declare that that body of men to whom the people have committed the sovereign function of making the laws for the commonwealth have deliberately disregarded the limitations imposed upon this delegated authority, and usurped power which the people have been careful to withhold; and it is almost equally so when the act which is adjudged to be unconstitutional appears to be chargeable rather to careless and improvident action or error in judgment than to intentional disregard of obligation. Courts ought never to declare a statute void unless its nullity and invalidity are placed, in their judgment, beyond reasonable doubt. Such a ruling ought not to rest on vague conjecture." Cooley, Const. Lim. 159, 182, 183. The validity of an act is to be presumed until its invalidity is proved beyond a reasonable doubt. *Ogden* v. *Saunders*, 12 Wheat. 213. The opposition between the constitution and the law should be such that the judge feels a clear

and strong conviction of their incompatibility with each other. *Fletcher* v. *Peck*, 6 Cranch, 87, 128. A legislative act is not to be declared void upon a mere conflict of interpretation between the legislative and judicial power. Before proceeding to annul by judicial sentence what has been enacted by the law-making power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption. *People* v. *Supervisors*, 17 N. Y. 241. The judicial power in declaring an act of the legislature void does not proceed upon the theory that it has superiority over the legislative, or that laws, to be valid, must conform to its notions of wisdom or propriety. The duty and responsibility is upon the courts to decide, when the question is presented to them, whether an act the constitutionality whereof is assailed transgresses the inhibitions of the fundamental law; and, if found so to do, it is no law, and is to be so declared. It is manifest that the duty should be proceeded upon with great caution and hesitation, since one co-ordinate branch of the government—the judicial—is thus asked to determine that another branch—the legislative—has erred. That this should be fearlessly done in a proper case is undoubtedly true, but it is as true that the power is not to be exercised unless the necessity for so doing is clearly apparent.

All the authorities are, I believe, to the effect that in a doubtful case a statute assailed as unconstitutional should not be judicially declared so to be. The grounds and reasonableness of the rule appear in the citations already made, and no reason is perceived why it should not have application in every case, whether civil or criminal, in whatever manner the doubt may arise, and whether it be on a question of law or fact. And all of these considerations apply with peculiar force when the question is presented on a motion before a single judicial officer. *Macomber* v. *Mayor*, 17 Abb. Pr. 35. In several jurisdictions it is the constant practice not to allow a case involving a constitutional question to be heard until every member of the court is present. Indeed, in one state (Rhode Island) it is provided by statute that whenever the constitutionality of any legislative act is called in question in any other than the supreme court, such court shall rule the act to be constitutional, and, if its judgment is rendered against the party raising the question, it shall certify the cause to the supreme court for its decision. A writer has recently said that "a deference to the opinion of the legislature, and a modest consciousness of one's liability to err, would naturally prevent a single judge from declaring an act to be unconstitutional, except in a clear case." It was declared in *Re Donohue*, *supra*, that it is safe and better, when a judgment has been rendered, which an express statute authorizes, to leave its review to the regular and more deliberate process of the higher courts than to make of every court and officer authorized to issue this writ a tribunal summarily to decide such grave and momentous questions.

From the foregoing authorities three rules appear, and they are: *First*, that to every legislative act there attaches a presumption of constitutionality, and the burden of showing it to be unconstitutional is upon him who assails it; *second*, that no such act should be annulled by the judiciary as opposed to the fundamental law in a doubtful case; and, *third*, that when a constitutional question arises before a single magistrate he should only declare the law invalid when his duty so to do is entirely clear, and that in any case of grave import he is justified, if not by propriety required, to leave the matter to the deliberation and determination of appellate tribunals. Applying, then, these principles to the present case, the questions are whether the prisoner has overcome that presumption; whether he has made it appear, by proofs or otherwise, beyond doubt, that the statute of 1888, in regard to the infliction of the death penalty, provides a cruel and unusual, and therefore unconstitutional, punishment; and that a force of electricity sufficient to kill any human subject with celerity and certainty when scientifically applied, cannot be gen-

erated. In my judgment these questions must be answered negatively. The utmost that can justly be said in his favor is that there is diversity of opinion on the principal question. Before the statute can rightfully be abrogated, there should be judicial knowledge that the punishment therein provided is cruel and unusual. There is no such knowledge, and his contention fails. In any case, the gravity of the matter demands that it be left to the courts for their determination. If these views are correct, the claim so earnestly and eloquently pressed by the learned counsel for the prisoner to the effect that, if it is doubtful that electricity will kill at once, and therefore painlessly, in every instance in which it may be administered to take the life of a culprit as condign punishment, his client should be discharged, as there is and can be no valid law in this state whereby even a convicted murderer can be delivered over to an experiment, and that to hold otherwise is a rule against at least the spirit of the constitution, cannot be here allowed.

I do not discuss the testimony, for, in view of the understanding that the matter is to engage the attention of the intermediate and ultimate courts of appeal, it would be·a work of supererogation so to do, inexpedient and profitless.

There is still another factor in the case, to which no allusion has been made, but which has no little weight in determining my course of action, and it is that the court of oyer and terminer, in passing sentence upon the defendant, by implication at least must be deemed to have pronounced in favor of the constitutionality of the disputed law. Judicial comity and a decent respect for that tribunal would seem to require that I follow that ruling. *People* v. *Fancher*, 2 Hun, 226, 235.

Having thus sufficiently indicated the grounds of my decision, consideration of the other questions suggested on the argument is unnecessary. An order will be made remanding the prisoner.