STATE OF IOWA, Appellee, v. ARCHIE BURRIS, Appellant.

**JURY:** Summoning—Right of Jury Commission to ''Hold Over.''
1 Failure of the court to appoint a jury commission at the time provided by law authorizes the *then* qualified and acting commissioners (inasmuch as they are originally appointed to serve *''until their successors are duly appointed and qualified''*) to ''hold over,'' and to select the petit and grand jurors for the ensuing statutory period.

**JURY:** Summoning—Jury Commission—Time of Meeting Directory.
2 The action of the jury commission in selecting petit and grand jurors on a date later than that designated by statute is not illegal, in the absence of a showing of prejudice. Especially is this true

when, in a criminal cause, it is made to appear that the defendant, at the impaneling of the grand jury, waived all objection thereto.

**WITNESSES:  Cross-Examination—Criminal Cause—Bad-Faith Examination.** The right of the State, on the cross-examination of the accused, to delve into the antecedents of the latter, as bearing on his *credibility*, does not embrace the right even to *propound* questions to the accused concerning alleged past misconduct when such misconduct, if true, is wholly foreign to the cause on trial, and when it is manifest that the public prosecutor is not attempting to establish, directly or indirectly, a fact, *but to poison the minds of the jurors against the accused by insinuations of wrongdoing.*

**WITNESSES:  Credibility of Good-Character Witness.** A witness who has testified to the good character of an accused as to a certain trait of character may not be asked, on cross-examination, whether he has ever heard of certain misconduct on the part of the accused, *when such misconduct, if it did occur, is wholly foreign and irrelevant to said trait.*

**CONSTITUTIONAL LAW:  Cruel and Unusual Punishment.** Death by hanging is not a "cruel or unusual punishment," within the meaning of the Constitution.

*Appeal from Wapello District Court.*—F. M. HUNTER, Judge.

OCTOBER 17, 1922.

DEFENDANT was convicted of murder in the first degree, and sentenced to be hanged. He appeals.—*Reversed.*

*W. W. Epps,* for appellant.

*Newton W. Roberts,* County Attorney, *W. L. Simmer,* and *Ben J. Gibson,* Attorney General, for appellee.

FAVILLE, J.—Appellant is a colored man, twenty-nine years of age. At the time of the trial, he had lived in Ottumwa about ten years, had been married about six years, and was the father of three children. During the time he had lived in Ottumwa, his business had mostly been working with automobiles, as chauffeur and mechanic. For some time prior to the homicide in question, he had been engaged in the taxi business—his mother-in-law having helped him to purchase a car. Hattie

Bates was a married woman. She and her husband were sepa-
rated, and she was living with her sister, a Mrs. Allen, in Ottum-
wa. About October, 1921, the appellant began calling at the
Allen home, and from that time on, he and Mrs. Bates were
together frequently, and their relations were intimate. Some
time in the fall or early winter of 1921, the appellant purchased
an automatic Colt revolver, which he carried with him there-
after. His explanation of the purchase of the revolver was that,
in his business as a taxi driver, he was frequently called upon
to be out at night, and to take drives in the country, and that
he frequently had money on his person, and that he secured the
revolver for his own protection. It appears that various taxi
drivers in the city of Ottumwa had headquarters at what is
referred to in the evidence as the "taxi shanty," where there
was a telephone, and at which place they received calls for their
services. In the afternoon of December 17, 1921, the appellant
and one Nosley were at the "shanty," when Nosley received a
telephone message from appellant's wife. At that time, Nosley
said to the appellant something to the effect that the latter
would owe him a dollar; that his wife had telephoned Nosley to
take her some place: and appellant replied, in effect, "She has
got money, let her pay her own bills." Nosley took his car and
got Mrs. Burris and took her out to the home of Allen, where
Mrs. Bates lived. Shortly after that, the appellant drove out
to the Allen home. At that time, Mrs. Bates, her sister Mrs.
Allen, the appellant's wife, and one Charley Johnson were at the
house. They were all colored people. The evidence tends to
show that, when the appellant arrived, he entered the house and
addressed his wife, saying: "I have come to straighten up these
lies you have been telling about me." There was considerable
conversation between the parties, during which time appellant
was called to the telephone. His wife said to him, "You have got
that old gun in your pocket now,"—to which appellant said:
"No, I haven't. It's in the car." His wife said to him, "I am
through with you,—take the car home, get your clothes, and go
to Mrs. Bates;" and Mrs. Bates said: "I don't want you. You
have lied to me; so stay with your wife." Thereupon, appellant
said: "You call me a coward. I am going to do the cowardly
act;" and with that, he drew the gun from his pocket. It was

immediately discharged, the bullet striking Hattie Bates in the abdomen. Appellant's wife jumped from her chair, and three more shots were fired, all of which were in the general direction of appellant's wife. Mrs. Bates was taken to the hospital, where an emergency operation was performed, and it was found that the bullet had severed a large artery in the abdomen, from which there had been profuse bleeding; and she died within a few hours. After the shooting, appellant left the house and drove directly to the courthouse and surrendered himself to the sheriff, and delivered to him the gun with which he had done the shooting. Appellant testified in his own behalf that he had no intention of shooting, but that he pulled the gun out for the purpose of scaring the parties, and that he held the gun down with both hands, and jerked it around, and it went off; and that he had no intention to purposely fire it.

We have not attempted to set out the details of the evidence, as related by the various witnesses. There is comparatively little conflict in the testimony as to what took place at the Allen house, and the foregoing is the general substance of the transaction, sufficient for the consideration of the questions at law involved in this appeal.

I. Appellant moved to quash the indictment on the ground that the grand jury which found the same had not been drawn in the manner provided by law. Wapello County is a county having a population in excess of 20,000, and contains the city of Ottumwa, having a population in excess of 15,000. The statute provides that in such counties the jurors are to be chosen by a jury commission. The original act providing for the creation of a jury commission is Chapter 267 of the Acts of the Thirty-seventh General Assembly. It provides that, in all counties having a population exceeding 20,000, in which there is a city having a population of 15,000 or more, the judges of the district court shall, on or before the first day of October in each year, select and appoint three competent persons as a jury commission. The commissioners shall, after their appointment, and before the 10th day of October in each year, qualify by taking an oath of office, and shall hold office for the term of one year, and until their successors are duly appointed and qualified. The

1. JURY: summoning: right of jury commission to "hold over."

commission shall meet on the first Monday after the 10th day of November in each year, and select grand and petit jurors for the year beginning the first day of January next after the meeting of such commission.

Chapter 211 of the Acts of the Thirty-eighth General Assembly amended Section 5 of Chapter 267, Acts of the Thirty-seventh General Assembly, by striking therefrom the words "first Monday after the 10th day of November in each year," and inserting in lieu thereof the words "second Monday after the general election in each year such election is held, and the first Monday in November in each year in which no general election is held."

Chapter 278 of the Acts of the Thirty-ninth General Assembly again amended this section with regard to the time of meeting of the commission, by striking therefrom the words "and the first Monday in November in each year in which no general election is held," and also by striking out the words "year" and "annual," as they appear in Chapter 267, Acts of the Thirty-seventh General Assembly, and inserting in lieu thereof "two years" and "biennial;" so that, as finally amended, this section provides for a meeting of the commission once in two years, and the selection of jury lists for a biennial period. This last statute went into effect July 4, 1921.

The appellant's contention is that, under the statute, there was no jury commission in existence for the year 1921, because of the provision of the statute that the judges shall appoint the jury commission on or before the first day of October in *each* year; and that the commission in Wapello County was appointed in the year 1920; and that no such commission was appointed on or before the first day of October, 1921.

By Section 4 of Chapter 267 of the Acts of the Thirty-seventh General Assembly, it is expressly provided that the commission, after their appointment, shall hold office *"until their successors are duly appointed and qualified."* No question is raised but that the jury commission was duly appointed and did duly qualify in the year 1920. If no new commission was appointed by the judges prior to October 1, 1921, the commission that was duly appointed in 1920, and that qualified in that year, would hold, under the statute, for the term of one year, and

until their successors were duly appointed and qualified. Under these provisions of the statute, the commission appointed before October 1, 1920, that had duly qualified, was, when no successors had been appointed, authorized, under the terms of the statute, to act as a jury commission in the year 1921, and to prepare jury lists in said county for the year 1922. This was evidently the purpose and intent of the legislature. In any event, the commission was a de-facto commission, and its act in preparing jury lists in 1921 for the year 1922 was not invalid and void. The record shows that the commission used the jury lists prepared by them in the year 1920 as the lists for the year 1922. The amendment to the statute, as enacted by the thirty-ninth general assembly, provides that the commission shall meet biennially in the same years as the general election, and prepare the jury lists for the two-year period. This amendment did not go into effect until July 4, 1921; but the commission that had been appointed in 1920 and had prepared a list that year, met in 1921, and used the jury lists that had been prepared in 1920, for the year 1922. This was, in practical effect, carrying out, as nearly as could be, the plan provided for by the enactment of the thirty-ninth general assembly providing that the commission should meet on the first Monday after the 10th day of November, and prepare lists for a biennial period. In the instant case, the evidence shows that the jury commission did not meet until some time in December of 1921, at which time they authorized the use of the jury lists that had been prepared the year before. As before stated, the jury commission appointed in 1920 had power to act in the selection of the jury lists in the year 1921 for the year 1922, inasmuch as no successors had been selected or qualified; and the adoption by the commission, at the meeting in 1921, of the lists which had been selected by the commission in 1920 was at least a recognition of the intent of the legislature, as expressed by the amendment to the statute adopted by the thirty-ninth general assembly. It was not a substantial departure from the provisions of the law. The commission readopted the lists for 1921 that had been selected and adopted by them in the year 1920. This was all that the law required.

It is urged that the meeting was not held in November on

the date fixed by the statute, and that the jury commission did not meet until the following December. The provision of the
statute with regard to the date of the meeting of the jury commission is directory, and not mandatory, and the selection of the jury lists in December, instead of November, as provided by the statute, did not render such lists invalid and void. The meeting, although irregular, was not illegal or invalid; and, unless some prejudice is shown to have resulted from the failure of the jury commission to meet at the designated time, their action at a subsequent date was not invalid. As bearing on the question, see *State v. Graff*, 97 Iowa 568.

*2. JURY: summoning: jury commission: time of meeting directory.*

Furthermore, it affirmatively appears that the appellant herein had been held to answer to the grand jury, which convened in January, 1922, at which time he was indicted, and that, at the time of the impaneling of said grand jury, he appeared in open court, and expressly waived any challenge to the grand jury. It also appears that he did not exhaust his peremptory challenges to the trial jury.

The objections now urged by the appellant to the grand jury and trial jury are without merit, and the court did not err in overruling them.

II. Appellant was a witness in his own behalf, and on direct examination, gave his version of the transaction at the time of the homicide. On cross-examination, he was asked this question:

*3. WITNESSES: cross-examination: criminal cause: bad-faith examination.*

"During the time you worked for J. G. Sax, did you take some white girls out riding in J. B. Sax's car?"

Proper objection was interposed to this question, which objection was overruled; and the appellant answered, "No, sir." Whereupon, the prosecutor asked the appellant:

"Did you, in company with another fellow, take two white girls to the Ogg schoolhouse?"

Proper objections were interposed, which were overruled, and the following occurred:

"Q. Did you have those two girls down there by the Ogg schoolhouse, and stop your car there, you four there together,— two white girls? (Same objection. Overruled.) A. No, sir.

Q. You deny that, do you? (Mr. Epps: Same objection, and not fair question. Same objection. Overruled.) Q. Do you know a white girl that wears tortoise shell glasses, a kind of sunburnt hair, that you have taken out in your car? (Same objection.) A. No, sir. Q. Never had any such girl out in your car? (Same objection, overruled.) A. No, sir. Q. Did you have that girl down at the Ogg schoolhouse, one night, when you were driving for J. B. Sax? (Same objection, same ruling.) A. No, sir.''

No one can reasonably doubt that this cross-examination of the appellant by the prosecutor, under the facts of this case, was highly prejudicial to the appellant. In ruling upon the objections to the evidence, the lower court indicated that the examination was proper, as affecting the credibility of the witness. These questions were clearly not proper cross-examination, and can be defended solely on the ground that, when the appellant tendered himself as a witness in his own behalf, it opened up to the prosecutor the right to interrogate him in regard to any actual or assumed misconduct on his part of which he might or might not have been previously guilty, for the purpose of testing his credibility.

Code Section 5485 is as follows:

''When the defendant testifies in his own behalf, he shall be subject to cross-examination as an ordinary witness, but the State shall be strictly confined therein to the matters testified to in the examination in chief.''

We have held that, when a defendant in a criminal case testifies in his own behalf, he stands upon the same footing as any other witness, for cross-examination with relation to his memory, motives, history, or matters affecting his credibility. *State v. O'Brien,* 81 Iowa 93; *State v. Watson,* 102 Iowa 651, 654; *State v. Chingren,* 105 Iowa 169, 172; *State v. Kuhn,* 117 Iowa 216; *State v. Brandenberger,* 151 Iowa 197; *State v. Peirce,* 178 Iowa 417; *State v. Brooks,* 181 Iowa 874; *State v. Brennan,* 185 Iowa 73.

It is also true that the extent to which such inquiries may be carried necessarily rests largely in the sound discretion of the trial court. *State v. Chingren,* supra; *State v. Brandenberger,* supra.

Section 5485 is not meaningless, and it should be respected and enforced by trial courts in accordance with its manifest purpose. When the cross-examination of a defendant is not strictly confined to the matters testified to in the examination in chief, it must be limited, even under our previous holdings, to such matters as properly inhere in a cross-examination, as affecting the credibility of the witness. But it is not within the province of a prosecutor, under the pretense of affecting the credibility of the witness, to propound interrogatories without any pretense, or to attempt to establish the truth of the matters suggested by such inquiry, and solely to cast insinuations upon the defendant. To open the doors to the cross-examination of a defendant by a proceeding of this character would leave him subject to insinuation and suggestion of gross misconduct, without any semblance of basis to support the same, and with limitations fixed only by the extent of the imagination of the interrogator and his audacity in propounding the inquiries. It is no answer to say that the appellant was not prejudiced by this cross-examination because he answered the questions in the negative, and no attempt was made by the State to prove the truthfulness of the matters suggested in the inquiry. The credibility of witnesses is not to be tested by the suggestion of misconduct on cross-examination, with no pretense that such misconduct exists in fact.

We think it was an abuse of the discretion lodged in the trial court to permit this examination to be conducted to the extent that it was, and that it was necessarily prejudicial to appellant. It was an attempt on the part of the State to drag into the case, by insinuation and suggestion, matters that were collateral and irrelevant, for the obvious purpose of prejudicing the appellant in the eyes of the jury. Such methods to secure the conviction of one charged with crime do not comport with the spirit of fairness which has always been one of the most cherished tenets of our administration of criminal law.

In *State v. Thompson*, 127 Iowa 440, the defendant was on trial for murder. We said:

"Immediately after defendant had given his version of the transaction under investigation, he was asked on cross-examination: 'You never struck your sister in Pearl's presence, did

you, and knock her down?' Objecton as not cross-examination, and immaterial, was overruled. It should have been sustained, and the prosecutor directed not to drag irrelevant matter into the record.''

In *State v. Concord,* 172 Iowa 467, referring to the cross-examination of a defendant, we said:

''Of course, he is subject to impeachment as any other witness; but the State, in conducting the cross-examination, should be confined strictly to matters of impeachment, and not, under cover thereof, be permitted to inject prejudicial matter.''

In *Buel v. State,* 104 Wis. 132 (80 N. W. 78), the Supreme Court of Wisconsin aptly said:

''It is one thing to honestly ask questions on cross-examination for the purpose of discrediting a witness, and quite another to ask questions of a witness who is a party, especially in a serious criminal case, for the purpose of injuring his cause in the eyes of the jury, and leading them to believe he was likely, because of his bad character, to have committed the offense charged.''

We are not to be understood as holding that a defendant or other witness may not be properly subjected to cross-examination that may affect his credibility as a witness, but we do hold that questions of this character, reiterated without any foundation in fact to support the same, were improper cross-examination of the appellant, and that the objections thereto should have been sustained.

III.   Closely connected with the subject-matter of the foregoing discussion was the conduct of the prosecutor in the cross-examination of certain witnesses for the appellant. The appellant offered certain character witnesses, who testified in regard to their acquaintance with the appellant and as to his reputation for being peaceable and quiet. The questions on direct examination were expressly limited to his reputation with regard to these two matters. On cross-examination, some of these witnesses were asked if they had heard about the appellant's taking white girls out in his car for ''joy rides,''. and one was asked if he knew of the fact that appellant had been out with white women, and if he had heard that talked. In ruling upon

4. WITNESSES: credibility of good-character witness.

objections to questions of this character, the court said:

"It is one of the methods of searching his judgment as to what it takes to make a peaceable man and a quiet man. I believe it is competent."

This appellant was on trial for the crime of murder. The evidence of character witnesses as to his being a peaceable and quiet man was competent and admissible in his behalf, as bearing on the question as to whether or not a man of that character would have been likely to have committed the homicide, as claimed by the State. The fact, if it be a fact, that appellant had been out "joy riding" with white women would not tend to disprove that he was a peaceable and quiet man, nor was this proper cross-examination. It is no proof that a man is not peaceable and quiet, and that he is disposed to take human life, that he may have been guilty of "joy riding" under circumstances that do not reflect credit upon either his discretion or his morals. Questions of this character were repeated in the cross-examination of various witnesses for the appellant, and the appellant's objections thereto were overruled. They should have been sustained, and this evidence excluded. We have recognized the rule that, upon the cross-examination of character witnesses, they may be interrogated in regard to rumors and reports in the neighborhood, reflecting upon the particular character of the party about whom they have testified. *State v. Rowell,* 172 Iowa 208; *State v. Kimes,* 152 Iowa 240, 249. But the cross-examination of the witnesses in the instant case did not by any means conform to the rules recognized in our cases. The result could not be otherwise than to greatly prejudice the appellant, by the insinuations and suggestions contained in these interrogatories. The examination should not have been permitted in this way, and it was prejudicial error not to sustain the objections interposed to this cross-examination.

IV. The appellant contends that the provisions of the statute permitting the infliction of the death penalty for murder in the first degree contravene Section 17 of Article 1 of the Con-

5. CONSTITUTIONAL LAW: cruel and unusual punishment.

stitution, which provides that no cruel or unusual punishment shall be inflicted.

In *State v. Williams,* 77 Mo. 310, it is said:

"The interdict of the Constitution against the infliction of

cruel and unusual punishments would apply to such punishments as amount to torture, or such as would shock the mind of every man possessed of common feeling,—such, for instance, as drawing and quartering the culprit, burning him at the stake, cutting off his nose, ears, or limbs, starving him to death, or such as was inflicted by an act of Parliament as late as the 22 Henry VIII, authorizing one Rouse to be thrown into boiling water and boiled to death, for the offense of poisoning the family of the Bishop of Rochester.''

In *James v. Commonwealth*, 12 Serg. & Rawle (Pa.) 220, 223, it is said:

''It must be a very glaring and extreme case to justify the court in pronouncing a punishment unconstitutional on account of its cruelty.''

Judge Cooley says:

''Probably any punishment declared by statute for an offense which was punishable in the same way at the common law could not be regarded as cruel or unusual, in the constitutional sense.'' Cooley on Constitutional Limitations (7th Ed.) 472.

See, also, *State v. Becker*, 3 S. D. 29 (51 N. W. 1018); *State v. Driver*, 78 N. C. 423; *Miller v. State*, 149 Ind. 607 (49 N. E. 894); *Wilkerson v. Utah*, 99 U. S. 130; *In re Kemmler*, 7 N. Y. Cr. Rep. 350 (7 N. Y. Supp. 145); *Territory v. Ketchum*, 10 N. M. 718 (65 Pac. 169); *Sustar v. County Court*, (Ore.) 201 Pac. 445; *Hart v. Commonwealth*, (Va.) 109 S. E. 582.

The infliction of the death penalty by hanging is of ancient origin, and is not a cruel and unusual punishment, within the meaning of the Constitution.

For the reasons herein set forth, the judgment of the district court must be, and the same is, reversed, and the cause remanded for new trial.—*Reversed.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.