**STATE of Iowa, Appellee,**

v.

**Willie Benjamin LOVE, Appellant.**

**No. 63773.**

Supreme Court of Iowa.

Feb. 18, 1981.

Henry E. Nathanson, Cedar Rapids, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., and John Ehrhart, Asst. Linn County Atty., for appellee.

HARRIS, Justice.

This appeal follows defendant's convictions of second-degree murder (§ 707.3, The Code 1979) and attempt to commit murder (§ 707.11, The Code 1979). Finding no merit in the four assignments of error, we affirm the trial court.

At about noon on January 23, 1979, the defendant, accompanied by his girlfriend, drove to a Cedar Rapids bar. Defendant left his girlfriend in the car and entered the bar at about the same time a friend, Troy Perkins, also entered.

Already in the bar were Bailey Taylor, the bartender, Roy Williams (also known as Roy Brown), Hoover Coffee, Robert Williams, and Robert Musgrove. The defendant made his way to the bar, ordered a drink, and spoke with the others there with whom he was acquainted. Presently brothers Ernest and William Gibson entered the bar. William entered through a door located at the southwest corner of the building. At the same time Ernest came through the only other entrance which was located along the south wall, toward the east end of the building. Defendant was then standing in front of a jukebox located several steps inside the southeast door.

Ernest approached the defendant and called for him to come over. It is defendant's claim that, as he approached Ernest, Ernest opened his coat so that defendant could see a pistol tucked in Ernest's waistband. Others present deny seeing such a gun. As this was going on, William Gibson walked toward the two, defendant and Er-

nest, and stood at the end of a pool table near them, a few feet behind Ernest. Sensing trouble, Roy Williams elbowed Hoover Coffee, who was sitting next to him. Both immediately got up and left.

Defendant claims he thought the Gibson brothers were angry with him because of an earlier fight he had with their older brother, Mack Gibson. Accordingly, defendant claims to have then said, "Hey man, like, like I figured, you know, like, you know, your brother hit me first. Like I figured it was a fair fight, you know." The bartender testified he then heard defendant say, in a loud voice. "That's a damn lie."

At this point the evidence differs even more widely. Defense witnesses said Ernest Gibson drew what appeared to be a black metallic object and swung it at the defendant, hitting him in the left side of the head. The bartender, Hoover Coffee, and Robert Musgrove, on the other hand, testifying for the State, said they saw no object being pulled by Ernest Gibson and did not see him strike defendant. All witnesses agreed that a light in the corner where the two were standing was struck by Ernest Gibson and broken. This further obscured the already dimly lit corner of the bar.

Robert Williams began moving toward cover behind the bar. Robert Musgrove moved quickly toward the west end of the bar to hide behind some tables. Troy Perkins ducked under the pool table. Defendant claims he then stumbled against the east wall of the building because of a blow from Ernest Gibson and that Ernest Gibson stepped toward him and confronted him with a gun. He says he therefore drew his gun and fired in self-defense.

The State's testimony of course disputes this. When the bartender, Bailey Taylor, saw the confrontation he ducked for cover behind the bar. Before doing so he observed William Gibson move to a position behind his brother.

Defendant fired his weapon toward Ernest Gibson and saw Gibson's head suddenly tilt forward. Then defendant stepped to his left. He claims he then headed toward the nearest exit. He says William Gibson was still standing close by. He said that William Gibson had a reputation for generally being armed and had shot and killed a man outside the same bar the previous year. According to his testimony defendant was therefore concerned. This concern, coupled with a dazed condition from the blow received from Ernest, caused him to think William was in the process of shooting at him. Defendant admits he fired in William's direction. William then headed for cover behind the bar. Defendant fled. As he drove away he threw his weapon, a .22 caliber pistol, into a snow bank from which it was recovered by a citizen and turned over to the police.

After defendant left the bar Robert Williams called the police. William Gibson had sustained two gunshot wounds, one in his neck and a superficial wound across the front of his right leg. Ernest Gibson sustained one gunshot wound from the pistol. The bullet entered Ernest's body from the left side of his neck, passing through the spinal cord and lodging just to the right of it. The examining physician testified that it was probable that Gibson had been shot while standing near someone else who was standing to his side and slightly behind him.

Immediately after the shooting, before the police arrived, William Gibson, although bleeding, walked around the inside and outside of the bar. Several witnesses saw him go to the bathroom. The two witnesses, Coffee and Roy Williams, who had left when they suspected trouble, saw him outside the bar leaning over a trash barrel. When the police arrived none of the witnesses told them about William Gibson's activities after the shooting or that they had seen the Gibsons with a gun. The trail of William Gibson's blood in the snow outside the bar was shown to the police but the area was not sealed off or searched for evidence.

Later the same day, after the police had left the bar, Roy Williams and Landy Waller searched the snow in back of the bar in the area where William Gibson had been seen after the shooting. There they found

a .22 caliber pistol. Waller took possession of the weapon but did not testify at trial.

After the shooting a fourth Gibson brother, Edgar, received word that two of his brothers had been shot. He testified that he went to the hospital and talked to his brother William. Edgar claims that William told him he had removed heroin from Ernest's pocket and hidden it in the bathroom. Edgar also claims that William told him he had hidden a gun outside in the snow. Edgar Gibson returned to the bar and found the heroin but not the gun.

Defendant was arrested later in the day and taken to the hospital where he was treated for a laceration on his left temple. The treating physician testified the laceration was caused by a blunt instrument. Although he was seriously wounded and hospitalized for several days, William Gibson survived the shooting. Ernest Gibson died as a result of the shot fired by defendant. For the killing of Ernest, defendant was tried for first-degree, and was convicted of the included offense of second-degree murder. He was tried and convicted of attempting to murder William.

I. Defendant's first challenge is to the sufficiency of the evidence to show premeditation, deliberation, or malice. We can set aside the challenge to the sufficiency of the evidence of premeditation or deliberation. Those are showings necessary to prove first-degree murder under section 707.2. They are not required to show second-degree murder under sections 707.1 and 707.3. It is the duty of a jury, if it finds against a defendant, to find guilt of the highest offense proven by the evidence. *State v. Drosos*, 253 Iowa 1152, 1164, 114 N.W.2d 526, 533 (1962). Since the jury in effect found the defendant not guilty of first-degree murder he cannot complain of any failure on the part of the State to prove elements necessary only for first-degree murder. *See State v. Brooks*, 181 Iowa 874, 890–91, 165 N.W. 194, 200 (1917).

II. It remains for us to consider defendant's challenge to the sufficiency of the evidence to show that the killing of Ernest was done with malice, an element of all murders under section 707.1. Malice, in homicide cases called malice aforethought, is "that condition of mind which prompts one to do a wrongful act intentionally, without legal justification or excuse." *State v. McCollom*, 260 Iowa 977, 988, 151 N.W.2d 519, 525 (1967). It need not exist for any specific period of time. It is sufficient if it exists any time before the killing. *State v. Hofer*, 238 Iowa 820, 834, 28 N.W.2d 475, 482 (1947). The use of a deadly weapon, accompanied by an opportunity to deliberate, even for a short time, is evidence of malice. *State v. Frazer*, 267 N.W.2d 34, 39 (Iowa 1978); *State v. Hahn*, 259 N.W.2d 753, 758–59 (Iowa 1977).

Defendant cites our decisions in *State v. Borwick*, 193 Iowa 639, 187 N.W. 460 (1922), and *State v. Wilson*, 234 Iowa 60, 11 N.W.2d 737 (1943), to support his position. Neither case is in point. In *Borwick* there was no question that the victim was the aggressor. Here there is conflicting testimony on the point and we are bound by the version of the evidence most consistent with the jury verdict. R.App.P. 14(f)(1). In *Wilson* the victim picked up a club, stating that he was going to knock Wilson's head off, and attempted to do so. The State's version of the evidence here does not make the victim the aggressor.

Defendant's first assignment is without merit.

III. In a separate assignment the defendant asserts that he was denied a fair trial by several instances of prosecutorial misconduct. To prevail on this assignment defendant must show the misconduct and also that he was prejudiced by it. Trial courts have considerable discretion in ruling on motions for new trial, including those grounded on claims of prosecutorial misconduct. We do not overturn trial court rulings in the absence of a showing of abuse of that discretion. *State v. Harrington*, 284 N.W.2d 244, 251 (Iowa 1979). With these general principles in mind we take up defendant's various complaints against the prosecutor.

■ Defendant called Roy Williams who testified he was in the bar on the day in question but left just before the shooting started. During Williams' cross-examination by the State he was asked about other, unrelated criminal conduct. Over defendant's objection that the question was irrelevant and immaterial, the witness was asked about an incident, January 23, 1979: "Did Willie Love snort coke?" Because the incident was unrelated the general objection was probably sufficient to preserve any error. *State v. Clay*, 213 N.W.2d 473, 477 (Iowa 1973). But any error in the ruling was rendered harmless by the witness's answer: "Not in my presence . . . ."

■ In another instance it is complained that the prosecutor misrepresented evidence of the murder weapon. The prosecutor referred to a pistol as "Willie Love's gun that killed Ernie Gibson." At this point in trial the weapon, although in evidence, had not yet been identified as defendant's. This was done later during the trial. There was however no evidence that the fatal bullet was fired from it. Defendant argued for mistrial and insists on appeal that the prosecutor was not asking a question but was making a statement to the jury and misquoting the record. After denying a motion for new trial the trial court admonished the jury:

Ladies and gentlemen, I'm sustaining the defendant's objection to counsel's remark, concerning the last one made by State's counsel, the objection being that it was a misstatement of the record. I sustained the objection. You are admonished and directed to disregard Mr. Ehrhart's statement as made.

We have consistently held:

Only in extreme instances where it is manifest that the prejudicial effect of the evidence on the jury remained, despite its exclusion, is defendant denied a fair trial and entitled to a reversal.

*State v. Fuhrmann*, 257 N.W.2d 619, 623 (Iowa 1977). We find no reversible error on this complaint.

In the same manner we can set aside another complaint against the prosecutor's conduct in the cross-examination of Edgar Gibson, the brother of the two victims, who was called to testify as a witness for the defendant. Defendant again got a favorable ruling from the trial court. Again the jury was admonished to disregard the question and answer. This was ample to cure any claimed prejudice. *Fuhrmann*, 257 N.W.2d at 623.

■ Defendant also complains of an incident which occurred while he was testifying as a witness in his own defense. On direct examination defendant said Ernest Gibson confronted him in the bar about a fight the night before between defendant and Gibson's brother Mack. After the direct examination, defendant moved *in limine* to preclude the prosecutor from questioning him about any threats made by the defendant or his brother, Joe Love, to either of the Gibsons during the argument of the previous day. Defendant urged in the motion that there was no factual foundation for any such question and that it was more prejudicial than informative on the issue of motive or intent because it went only to show why the Gibsons might be angry with the defendant and not why the defendant would be angry with the Gibsons.

The trial court overruled the motion *in limine*. Thereafter, in cross-examining defendant, the State asked a number of questions inquiring into the background of bitterness and differences between him and the Gibsons. The trial court sustained objections to a number of these questions for the reason that they went beyond the scope of direct examination. Nevertheless, the State was allowed to inquire of the witness:

Q. When you and Ernie were having the discussion in the tavern wasn't he asking you why you beat up your sister and about that incident as opposed to the incident with Mack?

After the defendant's objection that the question went beyond the scope of direct examination was overruled, the witness answered: "I don't know of no time that he asked me nothing like that in no tavern."

We cannot say the trial court's allowance was an abuse of discretion calling for a reversal. *State v. Orozco*, 190 N.W.2d 830, 834 (Iowa 1971). In the first place the witness's answer was negative. Moreover, the question was not flagrantly improper. *See State v. Johnson*, 222 N.W.2d 483, 486–87 (Iowa 1974). Here the State, in reaction to a self-defense claim, was inquiring into his relationship with the Gibsons. The challenged question was asked in an effort to discredit the witness's earlier testimony that Ernest Gibson confronted him about a fight between defendant and Mack Gibson.

Defendant also complains there was prosecutorial misconduct because of another inquiry during his own cross-examination by the State. But again defendant's trial objection was sustained, though for a reason not urged on appeal. We fail to see how any prejudice can result to the defendant when the question was disallowed on a basis not now urged.

It is argued that the case must be reversed for the prosecutor's questions, notwithstanding the favorable trial court ruling and negative answers to the questions. It is said, on the basis of *State v. Johnson*, 222 N.W.2d 483, 488 (Iowa 1974), and *State v. Burris*, 194 Iowa 628, 636, 190 N.W. 38, 41 (1922), that the trial became unfair by reason alone of the questions.

The authorities generally deny a reversal on the sole ground of such questions unless bad faith of the prosecutor appears. 75 Am.Jur.2d, Trial, § 194 at p. 278; 88 C.J.S. Trial § 162 at p. 330. We should yield to the trial court's discretion in such matters unless that discretion is abused. *See Dezsi v. Mutual Benefit Health etc. Ass'n*, 255 Iowa 1027, 1038, 125 N.W.2d 219, 225 (1963).

Here defendant got, either from the trial court rulings or from favorable answers by the witnesses, everything he sought during trial in his attack on the questions. He did not move for mistrial on this ground. Had he done so we might know more on the question of the prosecutor's motives. As it is we find no abuse of the trial court's discretion.

The defendant's final complaint against the prosecutor is addressed to a remark during closing argument. The background was the absence of a likely witness. William Gibson, the alleged victim of the attempted murder, did not testify. Evidence indicated he was in Mississippi, staying with his mother. During the prosecutor's examination of Mack Gibson, the witness was asked if he knew why his brother William had not returned to testify. The defendant's objection that the question called for hearsay and the opinion and conclusion of the witness was sustained.

In closing argument defense counsel commented on the unexplained failure of the State to produce William Gibson, arguing it was hard to believe that William Gibson would have witnessed his own brother's murder and almost been murdered himself and yet would abstain from testifying. In rebuttal argument the prosecutor attempted to point out to the jury that he had tried to offer evidence to explain William's absence but had failed because of defendant's objections. He said, "Did I ask the question, and why isn't William Earl here? Okay. They don't want to know. We tried to get that evidence in, and in the same vein why all the hesitation about the day before?"

■ We need not consider whether the argument here was permissive because it was retaliatory. *But see State v. Hall*, 235 N.W.2d 702, 728 (Iowa 1975), *cert. denied*, 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977); *State v. Moreland*, 201 N.W.2d 713, 715 (Iowa 1972); *State v. Horsey*, 180 N.W.2d 459, 461 (Iowa 1970). We reject the complaint because defendant did not preserve error. He made no objection to the prosecutor's statement at the time. We have long followed the rule that:

Defendant had the duty to object at the time of argument to offensive or improper remarks made by the county attorney in his closing arguments, and unless such objection was made he waived his right to complain of such offensive or improper remarks in a motion for new trial or on appeal here.

*State v. Whitfield*, 212 N.W.2d 402, 406 (Iowa 1973).

We conclude that none of the prosecutor's actions, taken singly or together, constitute reversible error. Defendant's contention to the contrary is without merit.

IV. In another assignment the defendant argues the trial court erred in denying a motion for change of venue because of trial publicity. Prior to trial defendant moved for the change and offered newspaper clippings and two transcripts of television reports. Although the State filed no resistance the motion was overruled.

■ Our scope of review on the question is unique. We look to the record de novo and, on that basis, determine whether the trial court abused its discretion. *State v. Cuevas*, 288 N.W.2d 525, 527 (Iowa 1980); *State v. Paulsen*, 265 N.W.2d 581, 588 (Iowa 1978); *State v. Williams*, 207 N.W.2d 98, 110 (Iowa 1973). Under Iowa R.Crim.P. 10(9)(b) a change of venue must be granted when the court is satisfied such prejudice exists in the county of a scheduled trial that there is a "substantial likelihood a fair and impartial trial cannot be had there."

■ The news accounts submitted with defendant's motion were purely factual and informative, reciting the facts of the shooting, the apprehension of the defendant as a suspect, and the eventual death of Ernest Gibson. One story suggested that police had an inkling of trouble in the area of town where the shooting occurred but there was no suggestion that the defendant had been viewed with suspicion.

We find nothing here which suggests that defendant's right to a fair trial was impaired. The trial court did not abuse its discretion in denying the change.

V. The most troublesome assignment suggested by defendant complains of the failure of the State to disclose materially exculpatory evidence. Prior to trial defendant moved for the production of "any evidence, including oral or written statements, known to the State or which through the exercise of reasonable diligence become known to the State, which is favorable to the defendant, or may lead to the development of exculpatory evidence." When the order was made the witness Roy Williams had already stated in a deposition that he had seen William Gibson leave the bar after the shooting, lean over some garbage cans and go back into the bar. Williams said he looked around the area where Gibson had been but found nothing.

On the Friday before commencement of trial Roy Williams indicated a change in his testimony by informing an investigator of the county attorney that a gun had in fact been found outside the bar. According to the later story Williams, and a friend named Landy Waller, on the afternoon following the shooting, found a gun hidden near the building. Waller had taken the gun. Williams also told the investigator, in his later statement, that Ernest Gibson had obtained a gun from a man named Cleo Luter.

At trial Williams testified for the defense, relating some but not all of the information given the previous Friday to the investigator. He did testify that he and Waller had found a gun up under a hubcap near a bush. He did not, however, mention that Ernest Gibson had, reportedly, gotten the gun from Cleo Luter.

In his motion for new trial defendant relied in part on the disclosure of Williams' change in testimony. At hearing on the new trial motion, defendant's counsel made a professional statement that he was not aware of Williams' alleged discovery of the gun until just prior to his trial testimony and that he was not aware of Williams' claim that Ernest Gibson had obtained a gun from Cleo Luter until after the case had been submitted to the jury. He contends that the failure of the State to disclose materially exculpatory evidence denied him a fair trial. We think defendant was not denied a fair trial because much of the evidence was in fact disclosed and the rest was immaterial.

The question of suppression of allegedly exculpatory evidence is governed by *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois*, 408

U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Peterson,* 219 N.W.2d 665 (Iowa 1974). Under these authorities the due process question turns on two factors: the nature of defendant's request and the materiality of the evidence. Three situations have been analyzed.

▮ In the first situation the prosecution uses perjured testimony at trial. Here it is not required for the defense to make any request for exculpatory evidence. *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1934). The use of perjured testimony is fundamentally unfair so, even in the absence of any request, any conviction must be set aside if there is any reasonable likelihood the perjured testimony affected the result. *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 350.

▮ In the second situation the defense makes a pretrial request for *specific* evidence which is not disclosed. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. A conviction obtained under these circumstances will be set aside if the defense can show the suppressed evidence is material. In order for materiality to exist it must appear that the suppressed evidence affected the outcome of the trial. *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350.

▮ A third situation is the one involved here. It occurs when the defense asks for "anything exculpatory."[1] A failure in the third situation to turn over exculpatory material calls for an even higher standard of materiality. Here "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of a defendant's right to a fair trial." *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399, 49 L.Ed.2d at 352. Under this standard the defendant is entitled to a new trial only "if the omitted evidence creates a reasonable

doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355. *Armento v. Baughman,* 290 N.W.2d 11, 16 (Iowa 1980).

Williams changed his testimony here in two respects. The first was that Williams, according to his later story, saw a gun outside the bar. This testimony was presented to the jury and was thereby disclosed. *State v. Epperson,* 264 N.W.2d 753, 756 (Iowa 1978), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). *Epperson* suggests that with the trial disclosure the question remains whether there has been an infringement of due process in failing to produce the evidence at an earlier time. *Id.*

▮ Love argues that, had he been furnished the evidence sooner, he might have traced the weapon through Waller and introduced the gun. The time period involved in the nondisclosure was quite short, five days including a weekend. Defendant did not move for a continuance. He should not now complain that he lacked the time to investigate. In the new trial motion defendant did not assert the discovery of any additional evidence. We are left with the conclusion that any new trial would involve the same evidence. There was no due process infringement.

▮ We turn then to the fact that Williams later claimed Cleo Luter had given Gibson the gun. This evidence was neither disclosed nor presented to the jury. But the failure is not fatal because the evidence was not material. The evidence does not go to show that Gibson was armed with a gun *at the time of his encounter* with defendant. The fact that Gibson had access to a weapon was independently established by the defense and was never disputed by the State. Gibson's brother, Edgar, testified that Ernest owned a .38 caliber handgun. Any evidence that Cleo Luter had also furnished Gibson a gun would only be cumulative. It certainly would not have given any

---

1. *Agurs* indicates the third situation exists also when the defense makes no request at all. We are not here called upon to treat such a factual situation because of defendant's "dragnet" request.

additional indication that Gibson was armed at the time of his death. We cannot say this evidence "creates a reasonable doubt that did not otherwise exist."

We reject defendant's contention that he was denied a fair trial by the nondisclosure of exculpatory evidence.

As all defendant's assignments are without merit we affirm the judgment of the trial court.

AFFIRMED.

All Justices concur except McCORMICK and ALLBEE, JJ., who dissent and SCHULTZ, J., who takes no part.

McCORMICK, Justice (dissenting).

I dissent from parts of division III and V, and the result. Because I believe defendant was denied a fair trial, I would reverse and remand for new trial.

I. *Prosecutorial misconduct.* The prosecutor asked questions insinuating that defendant used cocaine shortly before the shooting and that he beat up his own sister the previous day. The prosecutor also stated during the course of his interrogation that defendant's gun was the one which had killed the victim and that the victim's clothing contained powder burns. Neither the insinuations nor statements had a factual basis in the evidence.

The fact the question concerning cocaine usage received a negative answer is not determinative of the present issue. The issue now is whether the insinuation in the question was prejudicial, either alone or in combination with the remainder of the prosecutor's conduct.

The same problem is presented regarding the insinuation during cross-examination of defendant concerning the origin of his dispute with the victim. The prosecutor suggested the confrontation occurred because the victim gave refuge to defendant's sister whom defendant allegedly had beaten up the previous day.

Similarly, the prosecutor told a witness a handgun in evidence had been "introduced into evidence as Willie Love's gun that killed Ernie Gibson." In reality, the State's evidence was that the bullet which killed Gibson was too mutilated to be tied to a particular weapon. One of defendant's theories of defense was that the victim may have been accidently shot from behind by his brother during the fracas. Other evidence supported that possibility. Therefore the prosecutor's statement, to which objection was sustained, was calculated to contradict the defense on a material issue.

Defendant's objection to the prosecutor's statement that the victim's clothing contained powder burns was also sustained, but of course not until the statement had been made in an effort to impeach defendant's version of the shooting.

This court has condemned such conduct by a prosecutor: "[I]t is not within the province of a prosecutor, under the pretense of affecting the credibility of the witness, to propound interrogatories without any pretense or attempt to establish the truthfulness of the matters suggested by such inquiry, and solely to cast insinuations upon the defendant." *State v. Burris*, 194 Iowa 628, 636, 190 N.W. 38, 41 (1922). The court said: "Such methods to secure the conviction of one charged with crime do not comport with the spirit of fairness which has always been one of the most cherished tenets of our administration of criminal law." *Id.* More recently, this court has said: "A defendant is denied procedural fairness when the prosecutor persistently attempts to secure his conviction on the basis of innuendo and insinuation having no basis in evidence." *State v. Johnson*, 222 N.W.2d 483, 488 (Iowa 1974); *see* 6 J. Wigmore, *Evidence* § 1808, at 371 (Chadbourn Rev. 1976) ("The jury may under certain circumstances obtain an impression, from the mere putting of illegal questions which are either answered in the negative or are not answered because illegal and excluded, that there is some basis of truth for the question. When a counsel puts such a question, believing that it will be excluded for illegality or will be negatived, and also having no reason to believe that there is a foundation of truth for it, he violates professional hon-

or."); ABA Standards, *The Prosecution Function* § 5.7(d), at 98 (Approved draft 1971) ("It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner knows he cannot support by evidence.")

It is unnecessary to determine whether the trial court was right in its rulings during trial. The critical inquiry is whether the cumulative effect of the prosecutor's conduct was sufficiently prejudicial to require sustention of defendant's motion for new trial. I would hold that the cumulative effect of the prosecutor's conduct, including his withholding of exculpatory evidence, was sufficient to deny defendant a fair trial.

II. *Withholding exculpatory evidence.* I cannot agree with the court that the evidence concerning the victim's acquisition of a handgun "does not go to show that Gibson was armed with a gun *at the time of his encounter* with defendant." The State's theory was that ill feeling existed between defendant and the Gibsons concerning one or more incidents which occurred the day before the shooting. In urging self-defense, defendant sought to show the victim was about to shoot him at the time he fired toward him. He also sought to establish that William Gibson was armed. Edgar Gibson testified the victim owned a handgun, and defendant introduced Roy Williams' testimony relating to finding a weapon where the evidence tended to show William Gibson hid it after the shooting.

The jury, however, could reasonably believe the weapon hidden by William Gibson was one he rather than defendant had at the time of the shooting. Furthermore, the evidence concealed by the State was not simply that defendant had access to a gun. Instead, it was that the victim had obtained a handgun from Cleo Luter *on the morning of the day the shooting occurred.* Viewed in the light of the State's theory that the shooting was provoked by something which had happened the day before, evidence that the victim armed himself on the morning of the shooting was critically important to the defense. It was an additional indication that the victim was armed at the time of the shooting. Thus it was of vital significance on the central issue in the case.

I would hold that the State's nondisclosure of this evidence was sufficient to deny defendant a fair trial. *See United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 352 (1976).

ALLBEE, J., joins this dissent.