John Albert KNOX, Jr., Applicant–
Appellant,

v.

STATE of Iowa, Respondent–Appellee.

No. 93–1770.

Court of Appeals of Iowa.

Feb. 28, 1995.

Patricia M. Hulting of Roehrick, Hulting & Moisan, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Robert P. Ewald, Asst. Atty. Gen., and Diann Wilder-Tomlinson, County Atty., for appellee.

Heard by HAYDEN, P.J., and SACKETT and HUITINK, JJ.

SACKETT, Judge.

This is an appeal from the trial court's denial of postconviction relief to applicant-appellant John Albert Knox, Jr. Knox contends: (1) the State failed to disclose exculpatory evidence; (2) the State acted in bad faith in dismissing an earlier charge in violation of his right to a speedy trial; and (3) his appellate counsel was not effective because he failed to preserve the issue of the jury foreman's alleged racial bias. We affirm.

In the late night of June 2, or the early morning of June 3, 1987, Elsie Gillam was stabbed in her bed. Elsie died several hours later in a hospital as a result of the stab wounds. On June 19, 1987, sixteen days after Elsie's death, the State, by a county attorney's information, charged Knox with sexual abuse in the first degree in violation of Iowa Code sections 709.1(1) and 709.2 (1987), and murder in the first degree in violation of Iowa Code sections 708.1 and 707.2 (1987). The crimes were allegedly committed by Knox on Elsie.

Knox filed a conditional waiver of a speedy trial until October 13, 1987, and later waived speedy trial until November 17, 1987. Trial was scheduled to commence on November 17; however, on November 12, 1987, five days before trial, the State filed a motion to dismiss. The motion was sustained.

On February 4, 1988, the grand jury reindicted Knox for the crimes of murder in the first degree and sexual abuse in the first degree, the same crimes he had been charged with earlier. He was tried starting on May 19, 1988. On June 8, 1988, a mistrial was declared after the jury became deadlocked and could not reach a verdict. He was retried on November 2, 1988, and convicted of murder in the first degree in violation of Iowa Code sections 707.2(1), (2), and sexual abuse in the first degree in violation of Iowa Code sections 709.1(1) and 709.2 (1987).

Knox appealed to the Iowa Supreme Court raising, among other issues, a challenge to the dismissal of the original charge and a challenge to the jury. Knox's conviction was affirmed. *State v. Knox*, 464 N.W.2d 445 (Iowa 1990).

Knox filed this petition for postconviction relief. After a hearing, the district court found Knox's claim was barred because he did not raise it on direct appeal. The district court found, even if the claim were to be considered, it was without merit because the "exculpatory evidence" he claimed the State failed to disclose was cumulative and there was no showing the State's motion to dismiss the original charge was in "bad faith." The district court found the Iowa Supreme Court had addressed the issue of bad faith adverse to Knox on direct appeal and Knox had presented no new evidence in the postconviction relief proceedings. Knox appeals.

Knox first contends the State, when it filed the motion to dismiss on November 12, 1987, had exculpatory evidence concerning a bloody print on a sheet on Elsie's bed at the time of the incident. Knox had filed an ongoing motion for production of exculpatory evidence and he contends the State did not make the evidence available to him prior to the November 12, 1987 motion to dismiss. Knox alleges he did not learn of the evidence until the trial on his petition for postconviction relief. He contends this supports a finding the State's November 12, 1987 motion was filed in bad faith, and he should not have been retried.

The State contends Knox is barred from resisting the issue in a postconviction relief proceeding because he could have raised it on direct appeal; the State was not obligated to disclose the challenged evidence; and Knox has not shown the required prejudice to succeed on this issue.

We first address the issue of whether Knox should have raised this issue earlier. The trial court found Knox should have raised it on direct appeal. Knox advances he could not have raised the issue earlier because the first time he learned of the evidence was in the hearing on his application for postconviction relief. The State argues, in its brief on this appeal, Knox knew or should have known the facts at the time of his direct appeal.

To adequately address this issue, we focus on the events that occurred within the several months preceding the time the State filed

its November 12, 1987 motion to dismiss the original case.

In August or September of 1987, the State discovered what looked to be a print on the sheet that had been on Elsie's bed. John Kilgore, a DCI laboratory analyst, reported the print was a "palm print" suitable for identification. Kilgore determined the palm print was not made by a number of persons, including Knox [1] and the victim. Kilgore reduced this information to a written report on September 15, 1987. In late October, Reed, of the Marshalltown Police Department, took the sheet to Arkansas to be examined by Ralph Turbyfill. Reed was in Arkansas with Turbyfill for three days and, when he left, Turbyfill told Reed it was his opinion the print was a left palm print. No written report was made by Turbyfill at that time. Turbyfill was to testify at Knox's trial it was his opinion it was totally possible this impression was made by both a hand and a foot and was not identifiable, contrary to his initial opinion.

Knox first learned of the print when the State filed a notice of additional testimony on November 6, 1987, and attached a copy of Kilgore's report. No mention was made of Reed's consultation with Turbyfill or of Turbyfill's opinion which, at that time, was the print was identifiable as a left palm print.

The State obtained a copy of Knox's footprint on November 10, 1987, and, on the same day, Reed made a written report the print on the sheet was not Knox's footprint. Apparently, at this point, the State decided to dismiss the case.

The first Knox learned the State was to dismiss the case was when Bill Springer, Knox's attorney at the time, was called by the Marshall County Attorney about five minutes to twelve o'clock noon on November 12, 1987, at his Marshalltown office. She told Springer there was a hearing scheduled on the State's motion to dismiss at 3:30 that afternoon before Judge Cady in Fort Dodge. Fort Dodge and Marshalltown are about ninety-six miles apart. Not until 1:27 p.m.

on November 12, was a notice of additional testimony filed with the Marshall County clerk attaching the report of the Marshalltown Police Department that the print of the sheet was not of Knox's foot. The report had been prepared two days earlier.[2] The filing made no reference to the Turbyfill consultation or his opinion.

Neither Knox nor Springer had been told of the Turbyfill consultation and opinion before or during the hearing on the motion to dismiss on November 12, 1987. Apparently, Turbyfill had prepared a written report on November 12, but it had not been received by the State. Springer testified at the postconviction hearing that when he arrived at the courthouse in Fort Dodge, he had not had an opportunity to prepare for the hearing or research the meaning of the motion. He testified he only had ten minutes to visit with his client and advise him of his doubts of the possibility of a valid reindictment. Springer testified, on the information available to them, Knox agreed to the dismissal.

Knox contends the first time he learned of the October Turbyfill consultation and opinion was when, at the postconviction relief hearing, Reed testified as follows:

Q. [H]ow soon after September 11th, 15th, or 16th did you become aware that John Kilgore had identified L–1 [the questioned print] on the bed sheet, L as being a patent palm print suitable for identification but not that of John Knox? A. I believe I became aware of that in August at some point. Exact date I do not know.

Q. Then when did you become aware that the palm print as identified by John Kilgore was not that of John Knox? Was that prior to the date these reports were made or after the reports were made?

. . . .

Q. Would it still have been in August?
A. Probably.

Q. So if I understand you, you became aware in August of 1987 that L–1 had been identified by John Kilgore as being a patent palm print suitable for identification

---

**1.** The State's theory in prosecution was defendant acted alone.

**2.** There is no proof of service on the filing or any indication it was delivered to Knox and his attorney prior to the hearing.

and not that of John Knox in August of 1987? A. Yes.

Reed went on to testify he had taken all the evidence to Arkansas to Turbyfill on October 26, and he and Turbyfill spent the next three days comparing on a one-to-one basis a number of prints and Turbyfill said, in doing so, "this [L–1] could be a palm print. It has that appearance; but then again so do feet." Reed went on to say he received the final report November 12th, at least that was when it was dated, but it could have been just mailed that day—later he referred to a letter on November 20th. Reed was asked whether he had conveyed the information about his October meeting in Arkansas and the oral opinions given him by Turbyfill to the assistant attorney general prosecuting the case and he was not certain he had. However, he was certain someone in the chain of command had conveyed this information to the prosecutors.

Knox contends had this information been known to him at the time of the hearing on the motion to dismiss, he would not have agreed to the dismissal decision. Knox also contends the evidence supports a finding the State dismissed the case in bad faith and in violation of his rights to a speedy trial.

■ With these facts in mind, we look at the State's argument Knox had the facts to raise this issue on direct appeal. First, the State points to Reed's testimony before the grand jury,[3] as follows: "I took the evidence to [Turbyfill] at the end of October. And I got a report back I believe it was either November or December." Secondly, the State points to testimony in the first trial by Turbyfill that Reed came to Arkansas in October of 1987; and direct testimony in second trial by Turbyfill that he was contacted on October 9, 1987. However, when Turbyfill was cross-examined in the second trial about the date, the following exchange occurred:

Q. Do you recall when it was that Roy Reed first contacted you concerning this impression [witness had just testified about the questioned print]? A. The exact date I'm not sure of. It was approximately a week prior to the examination. I believe I examined it sometime in the latter part of October 9, 1987.

Q. Latter October 1987? A. If I may refer to a letter I have in my briefcase, I can give you the date.

Q. Yeah, why don't you do that, please. A. I stand corrected on the date. It was November the 11th, the first time I was contacted with the—on this particular case.

The trial court found Knox had knowledge of this issue at the time of the direct appeal. The matter is confusing. We did not, after reading the record before us, come to the same conclusion the trial court had reached on this issue. We, therefore, reviewed the State's brief on direct appeal.

The factual scenario the State now asks us to accept is contrary to the argument the State made on the same issue in the State's brief filed on direct appeal in *Knox*, 464 N.W.2d 445 (Iowa 1990).

In the State's brief in the first appeal, the following representation was made:[4]

The record bears out this representation. Ralph Turbyfill, chief latent fingerprint examiner for the Arkansas State Crime Laboratory, testified that he was first approached for an opinion regarding this print on November 11, 1987, approximately a week after he was first contacted. After observing the print, Mr. Turbyfill testified at trial that the print could possibly have been a composite handprint and footprint. He also indicated that a positive identification of the print's maker[s] could

---

3. A transcript of the proceedings was apparently available to Knox prior to his appeal.

4. The State's brief was prepared by an assistant attorney general assigned to the appellate branch. There is no evidence this attorney would have participated in the motion to dismiss maneuvering or she would have had any knowledge except what appeared in the written record as to the facts of Turbyfill's involvement in the

case. We have found the version in the State's brief on direct appeal to conform to the record made through that time. The information we now have to the contrary came in the postconviction relief hearing. Consequently, we have no basis to believe the assistant attorney general preparing the brief in the direct appeal had any knowledge these representations she made in the brief were not correct.

not be effected, even had their identities been known, because the fabric material of the sheet made identification impossible.

*Turbyfill's opinion*[5] *was obviously not available to the prosecution before the motion to dismiss was filed. What may be deduced from the evidence is that, when the State filed its motion to dismiss, the State's experts disagreed about what the print reflected.... Thus, the procurement of another expert who believed the print could have been a composite was an additional piece of evidence which resulted from further investigation.* (Emphasis supplied.)[6]

We conclude, contrary to the trial court's finding, Knox was not aware of this evidence until his hearing in the postconviction relief proceedings. We disagree with the trial court's finding to the contrary and with the State's argument this issue could have been raised earlier.

■ We next address the State's argument Knox was not entitled to this information. The State contends it did not have to disclose "Turbyfill had determined the print was identifiable as a palm print and he could not contradict Kilgore's opinion."[7]

The State advances it had an open file policy and, if Knox's attorney had asked, the opinion would have been available to him.[8] We find it unnecessary to address these arguments. The State represented to the trial court it had turned over all information to defendant concerning the print.[9]

The defense attorney and the trial court had a right to rely on the testimony of the State's attorney that all information about the print had been turned over to Knox. "[T]hough the attorney for the sovereign must prosecute the accused with earnestness and vigor, he [or she] must always be faithful to his [or her] client's overriding interest that 'justice shall be done.'" *United States v. Agurs*, 427 U.S. 97, 110–111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342, 354 (1976); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935). He [or she] is the "servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Id.* This description of the prosecutor's duty illuminates the standard of materiality that governs his [or her] obligation to disclose exculpatory evidence. *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354.

5. While the opinion Turbyfill gave at trial was not available then, his original opinion was.

6. The supreme court in *Knox*, 464 N.W.2d at 446, said with reference to the motion to dismiss, "[j]ust prior to trial, the State was informed that there was an unidentified blood print on the sheet removed from the victim's bed." ... The State's motion stated that the newly discovered evidence was of an exculpatory nature, ... *Id.*

7. Knox's request for forensic examinations *was* specific:

    4. (d) all results and reports of scientific or laboratory tests and experiments made in connection with each item of physical evidence;

     .    .    .    .    .

    6. The results of all physical or mental comparisons in connection with this case, conducted by identification technicians, criminalists, or other persons, *whether or not completed, regardless of the outcome of same, and if they are reduced to writing*, provide copies of all laboratory reports of investigative summaries of the examinations, tests or comparisons.

8. Virginia Barchman, an assistant attorney general involved in the prosecution of the original case, testified at the postconviction relief proceedings that the motion to produce filed by the defendant did not require her to produce every "consult" that someone in the Bureau's laboratory had and she is not obligated to provide this information to the defendant in response to his motion to produce until she obtains a written report. She also testified exculpatory evidence should be produced to the defendant, even if it is not reduced to writing.

9. At the hearing on the motion to dismiss, Barchman was to testify:

    Q. Has the matter of this patent print been divulged to the Defendant through his counsel?
    A. Yes, sir, it has.
    Q. *Has all of the other information or any information that you have about that print and which you have been discussing here today also been divulged to counsel for the Defendant?* A. *Yes, sir, it has,* I am not positive the names of all the persons whose prints were compared with this unknown print have been divulged. However, the Defendant through his counsel is aware of how many persons have been examined. (Emphasis added.)

■ The State next advances Knox was provided with the exculpatory evidence and his claim is he was denied additional exculpatory evidence which was cumulative and consistent with the opinions already given. The State contends what happened did not rise to the level to show the State violated a constitutional duty to disclose and, as a result, Knox was not denied his right to a fair trial.

In *State v. Love*, 302 N.W.2d 115 (Iowa 1981), the court said:

The question of suppression of allegedly exculpatory evidence is governed by *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed2d 342 (1976); *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed2d 706 (1972); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Peterson*, 219 N.W.2d 665 (Iowa 1974). Under these authorities the due process question turns on two factors: the nature of defendant's request and the materiality of the evidence. Three situations have been analyzed.

In the first situation the prosecution uses perjured testimony at trial. Here it is not required for the defense to make any request for exculpatory evidence. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1934). The use of perjured testimony is fundamentally unfair so, even in the absence of any request, any conviction must be set aside if there is any reasonable likelihood the perjured testimony affected the result. *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 350.

In the second situation the defense makes a pretrial request for *specific* evidence which is not disclosed. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. A conviction obtained under these circumstances will be set aside if the defense can show the suppressed evidence is material. In order for materiality to exist it must appear that the suppressed evidence affected the outcome of the trial. *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350.

A third situation ... occurs when the defense asks for "anything exculpatory." A failure in the third situation to turn over exculpatory material calls for an even higher standard of materiality. Here "the prosecutor will not have violated his [or her] constitutional duty of disclosure unless his [or her] omission is of sufficient significance to result in the denial of a defendant's right to a fair trial." *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 352. Under this standard, the defendant is entitled to a new trial only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355; *Armento v. Baughman*, 290 N.W.2d 11, 16 (Iowa 1980).

*Love*, 302 N.W.2d at 122–23.

Knox claims the information would have benefited him in three ways:

1. He would have been able to more intelligently assess his response to the State's motion to dismiss and would have resisted the motion and forced the State to proceed to trial.

2. The information shows the State dismissed the case in "bad faith."

3. Had he had the information, he would have been in a position to impeach Turbyfill's testimony in the two trials that the print was not identifiable with Turbyfill's earlier inconsistent statement.

We agree with Knox, had his attorney had this information, he would have been better able to advise him on how to address the motion to dismiss. We do not condone the manner in which the State sprung this motion on Knox's attorney. Not only did he not have all the evidence but he, also, did not have the time he should have had to research the legal issues. But this is a petition for postconviction relief and, to be successful, Knox must show the suppressed evidence affected the outcome of the trial. *See Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350.

The question is, if Knox had the information and went ahead with trial, would the result have been different. For reasons we will discuss later in the opinion, we are unable to determine Knox can show the required prejudice. *See Brewer v. State*, 446 N.W.2d 803, 805 (Iowa 1989).

■ The next question is whether the record made at the hearing on the application for postconviction relief showed the State operated in "bad faith" in dismissing the original case. The supreme court, in the direct appeal, found the motion was not made in bad faith. *Knox,* 464 N.W.2d at 446. The Iowa Supreme Court addressed the bad faith of the dismissal and said:

> The State's motion to dismiss was the result of newly discovered evidence. Just prior to trial, the State was informed there was an unidentified bloody print on the sheet removed from the victim's bed. Analysis of the bloody print made just two days before the State moved to dismiss showed it not to be that of the defendant. The State's motion stated the newly discovered evidence was of an exculpatory nature, and the State was uncertain whether it was "morally, ethically and legally fair" to proceed against the defendant. It sought dismissal to allow it to conduct further investigation. The trial judge granted the State's motion, finding it was in the interest of justice.
>
> We have held facilitating the gathering of evidence is a proper reason for a rule 27(1) dismissal, *see State v. Brumage,* 435 N.W.2d 337, 340 (Iowa 1989); *State v. Fisher,* 351 N.W.2d 798, 801 (Iowa 1984); *State v. Johnson,* 217 N.W.2d 609, 612–13 (Iowa 1974), and Knox has failed to demonstrate any bad faith on the part of the State in seeking the dismissal to allow further investigation. Knox, in fact, did not resist the motion, apparently agreeing there were legitimate grounds for it.
>
> Defendant claims that the State's recharging him without new evidence demonstrates the dismissal was obtained in bad faith. Defendant's contention is without merit. The fact that a subsequent investigation fails to discover new evidence does not necessarily establish that the prior dismissal was without merit. Furthermore, contrary to Knox's contention, new evidence was uncovered after the dismissal. The State submitted the stained sheet to fingerprint experts, one of whom testified the bloodstain could have been a composite handprint and footprint. He further explained that a positive identification of the print maker could not be made, even if the maker's identity had been known, because the fabric material of the sheet made it impossible.[10] In the subsequent investigation, the State also found two Negroid hairs. One of these hairs was consistent with defendant's pubic hair and the other with his head hair. This additional evidence was also introduced at trial.
>
> Knox has failed to demonstrate that the dismissal in the furtherance of justice lacked adequate cause, that it was obtained in bad faith, or that the court otherwise abused its discretion. We believe the furtherance of justice, for both the State and the defendant was served.

*Knox,* 464 N.W.2d at 446–47.

The supreme court obviously was not aware of the initial consult with Turbyfill and his initial opinion. *See Knox,* 464 N.W.2d at 446. The State, on direct appeal, did not advise the court of the initial consult and opinion. The supreme court adopted the State's representation of the facts in its opinion in *Knox,* 464 N.W.2d at 446.

Therefore, we must make a determination if the supreme court had known of the initial consultation and opinion, whether it would have found the State operated in bad faith.

In *State v. Gansz,* 403 N.W.2d 778 (Iowa 1987), the court said in *Johnson,* 217 N.W.2d at 612, it recognized:

> if it could be demonstrated the prior dismissal, regardless of its stated purpose, was without adequate cause and it impacted unfavorably upon a defendant's speedy trial rights, the resulting delay in prosecution would warrant a dismissal on speedy trial grounds. Any other interpretation of *Johnson, State v. Moritz,* 293 N.W.2d 235, 238 (Iowa 1980), and *Fisher* would permit the State to employ dismissals under Iowa Rule of Criminal Procedure 27(1) in a manner which would thwart the defendant's speedy trial rights under rule 27(2).

*Gansz,* 403 N.W.2d at 780. Clearly, therefore, there must be a reason for the dismissal

---

**10.** This was Turbyfill.

other than to avoid the defendant's rights to a speedy trial. *Id.*

The State, when it made its motion to dismiss, unknown to Knox or his attorney, had contacted Turbyfill about the print and further inquiry showed the print to be a print not identifiable as Knox's. Unlike the representations made by the State in its brief in the original appeal, the consultation with Turbyfill had come much earlier and, obviously, the State was unhappy with the obtained results.[11] The reasons the court gave of the State seeking new evidence would have been the same in either case. We deny reversal on this ground.

■ The third issue is whether, if Knox had known Turbyfill had given a prior opinion inconsistent with his trial testimony, Turbyfill could have been impeached and the denial of the opportunity for impeachment is of sufficient significance that Knox was denied his right to a fair trial. *See Agurs,* 427 U.S. at 108, 96 S.Ct. at 2400, 49 L.Ed.2d at 352. Knox is entitled to a new trial "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355; *Armento,* 290 N.W.2d at 16. We find Knox, for reasons to be discussed later in the opinion, has failed to meet this burden.

■ Knox's last issue is his appellate counsel was ineffective. Knox, a black man, contends the foreman of the jury that convicted him had a racial bias. Knox contends, while his appellate counsel raised the issue on appeal, his brief acknowledged the trial court had correctly sustained testimony on the issue. Knox contends there was a legally insufficient record made on his jury bias issue and the record before the supreme court was lacking; consequently, the only conclusion the supreme court could reach was to rule on the record as made.

Knox contends, because the argument his trial counsel was not effective in not making a record was not made, the issue was not preserved for postconviction relief.

Knox was represented on appeal by John Burns who was with the State Appellate Defender's office for some time. Burns

raised the issue on appeal and was well aware there were several ways he could present it. He chose to ask the issue be preserved for postconviction relief. Burns testified he had observed the supreme court generally honored these requests. In this case, the supreme court refused to do it. On this issue the Iowa Supreme Court said:

Knox asks us to preserve for postconviction relief his claim that the jury foreman failed to disclose on voir dire that he was a member of Posse Comitatus. He argues that the issue should be preserved because it falls within the "newly discovered evidence" portion of the postconviction statute, which provides relief to applicants who can show that "[t]here exists evidence of material facts, not previously present and heard, that required vacation of the conviction or sentence in the interest of justice...." Iowa Code § 663A.2(4) (1989).

Section 663A.2(4) requires the applicant to show that "the evidence was discovered after judgment. He may not rely on evidence discovered after trial but before judgment unless he establishes an excuse for not having raised the issue in a motion for new trial...." *Jones v. Scurr,* 316 N.W.2d 905, 907 (Iowa 1982). Knox has failed to make this showing. There is no question that Knox discovered the evidence in question prior to judgment. In fact, he raised the issue in his motion for new trial prior to judgment.

Knox requests that this issue nevertheless be preserved because, while the testimony of a key witness was known to him at the time of his new trial motion, he was powerless to present it. While we have doubts about the extent of this absent witness's unavailability, we will assume for these purposes that he could not be produced at the hearing. In *Jones,* we considered the question of whether evidence that was unavailable, but known, at the time of a hearing is to be considered as newly discovered evidence. We held that it was not. *Id.* at 910.

Postconviction relief is not a means for relitigating claims that were or should

11. The trial court, in ruling on the motion to

dismiss, also was deprived of all the facts.

have been presented at trial. *Washington v. Scurr,* 304 N.W.2d 231, 234–35 (Iowa 1981); Iowa Code § 663A.8 (1989). The defendant should have and did present his claim in his motion for new trial. The fact that he failed to present sufficient evidence to warrant a new trial does not preserve his claim for postconviction relief. Accordingly, we decline to preserve this issue for postconviction proceedings.

*Knox,* 464 N.W.2d at 450. We affirm on this issue. Knox has failed to meet the requisites necessary to succeed on a claim brought for postconviction relief. The applicant must show actual prejudice as a result of the errors. *Brewer,* 446 N.W.2d at 805; *McKnight v. State,* 356 N.W.2d 532, 537 (Iowa 1984).

Before Elsie died, she told police she was assaulted by her neighbor. Knox was her neighbor. The yard of the apartment building where Knox lived abutted Elsie's yard. Gloves were found buried in the back yard of Knox's apartment building. Blood on the gloves was consistent with the blood type of Elsie and Knox. There was blood on a nearby fence. A Caucasian pubic hair similar to the known pubic hair of Elsie was found in the glove. Two hairs with Negroid features were recovered; one from the bedspread and one from the bodice of Elsie's nightgown. The hair on the bedspread was found to be similar to Knox's head hair and the nightgown hair was found to be similar to Knox's pubic hair. Two different types of hair, a head hair and a pubic hair, that both match reduces significantly the possibility the head hair and the pubic hair came from someone else. No other person of black descent lived in the neighborhood. An impression appearing to be reproduced in blood on Elsie's pillowcase was found to be consistent in appearance with a fabric reproduction produced from the edge of the glove. Fibers from the lining of the gloves were compared to fibers that had been found on the fence and the fibers were found to be similar types of fibers.

When asked who had done this to her, Elsie said "attack man."

There is substantial evidence to prove beyond a reasonable doubt Knox committed the crime of which he was convicted. He has

failed to show he was prejudiced by the State's failure to supply evidence of its initial contact with Turbyfill and Turbyfill's initial opinion.

**AFFIRMED.**

CADY, J., takes no part.